THE CADLE COMPANY *vs.* JAN R. SCHLICHTMANN & another.[1]

Essex. December 4, 2006. - January 17, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*"Anti-SLAPP" Statute. Constitutional Law,* Right to petition government. *Statute,* Construction.

A Superior Court judge did not err in denying special motions to dismiss, brought under G. L. c. 231, § 59H, the "anti-SLAPP" statute, by the defendants (an attorney and his professional corporation) in a civil action arising out of the defendants' allegedly false and defamatory statements concerning the plaintiff, where the defendants failed to demonstrate that the claims against them were based solely and exclusively on protected petitioning activity, as the statements in question, published on a Web site by the defendants while representing parties adverse to the plaintiff in litigation, were designed to disseminate to the public information about the plaintiff and, by doing so, to attract clients to the defendants' law practice. [247-254]

CIVIL ACTION commenced in the Superior Court Department on April 12, 2005.

Special motions to dismiss were heard by *Elizabeth M. Fahey,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Rodney A. Smolla,* of Virginia (*Edward J. Juel* with him) for the defendants.

*Howard M. Cooper* (*Ian Crawford* with him) for the plaintiff.

GREANEY, J. We examine in this case the extent to which G. L. c. 231, § 59H, popularly known as the "anti-SLAPP"[2] statute, effectively shields one party in an ongoing legal dispute from liability for the publication of allegedly defamatory statements concerning the opposing party. The Cadle Company (Cadle)

---

[1] Jan R. Schlichtmann, Attorney at Law, P.C., a professional corporation of which Jan R. Schlichtmann is the president and sole shareholder and director.

[2] SLAPP is an acronym for "strategic litigation against public participation."

filed a multi-count complaint in the Superior court seeking damages and declaratory and injunctive relief against Jan R. Schlichtmann and Jan R. Schlichtmann, Attorney at Law, P.C. (defendants), arising out of Schlichtmann's use of a Web site and interviews with the media to make allegedly false and defamatory statements concerning Cadle. The defendants filed in response two special motions to dismiss pursuant to G. L. c. 231, § 59H, which were denied by a judge in the Superior Court. The defendants appealed from that denial, and we transferred the case here from the Appeals Court on our own motion. For reasons that follow, we conclude that the judge properly denied the special motions to dismiss. Consequently, we affirm the order denying the motions and remand the case to the Superior Court for further proceedings.

1. The background of the case, drawn from the judge's decision and order denying the special motions to dismiss, may be summarized as follows. Cadle is a debt collection company with its main office in Newton Falls, Ohio. The individual defendant, Schlichtmann, is an attorney licensed to practice law in Massachusetts and, as has been noted, the president and sole shareholder and director of the defendant professional corporation. In the mid-1990's, Cadle and Schlichtmann became involved in litigation in connection with certain debts allegedly owed Cadle by Schlichtmann. In the early 1990's, Schlichtmann and his former law firm borrowed money from Boston Trade Bank. After the Boston Trade Bank failed, Cadle purchased Schlichtmann's debts from the Federal Deposit Insurance Corporation (FDIC). In October, 1991, Schlichtmann filed a petition under Chapter 7 of the Bankruptcy Code, see 11 U.S.C. § 301 (1988), and, in January, 1992, the Bankruptcy Court issued a discharge of debtor to Schlichtmann. Years of litigation followed over whether certain of Schlichtmann's debts had survived the discharge. Although litigation is always divisive and often contentious, the legal battles between the parties appear to have been particularly acrimonious.[3]

In the spring of 2003, Schlichtmann filed complaints with the

[3]The United States Court of Appeals for the First Circuit eventually concluded that Cadle had an interest in a monetary settlement received by Schlichtmann and his former law firm, see *Cadle Co. v. Schlichtmann*, 267

Commissioner of Banks on behalf of himself and various clients concerning the collection activities of Cadle. On March 31, 2003, Schlichtmann sent Cadle a G. L. c. 93A demand letter on behalf of four clients who, the letter alleged, had suffered losses as a result of Cadle's fraudulent business practices in Massachusetts. Schlichtmann began speaking out to members of the news media concerning Cadle, and he was quoted in articles published by the Boston Herald, the Business Journal Online, the Associated Press,[4] and the MetroWest Daily News. Statements in the articles attributed to Schlichtmann include the following:

> "According to attorney Jan Schlichtmann, who is also being dunned by Cadle, the firm has been doing business illegally in Massachusetts for years, hiding its assets from its clients and the state and defrauding both";

> "Schlichtmann says threats and harassment are typical of Cadle";

> "Schlichtmann says Cadle has used these same strong arm tactics here to collect millions from people in debt while avoiding paying taxes by hiding its assets in other companies owned by [Daniel C. Cadle, owner and president of Cadle]";

> "The Cadle Co. traffics in intimidation and fraud and it's catching up with them in Massachusetts";

> "According to Schlichtmann, the sole purpose of this enterprise is to defraud consumers and businesses, deceive state and federal courts, and avoid state laws and regulations meant to protect against predatory practices";

F.3d 14 (1st Cir. 2001), cert. denied, 535 U.S. 1018 (2002). After Schlichtmann purchased all claims belonging to Cadle against him at a sheriff's auction in Texas, the case was dismissed by a judge in the District Court of Massachusetts on the basis of mootness. On Cadle's appeal, the First Circuit affirmed the dismissal, holding that Cadle's previous representations to the court estopped it from asserting a continuing interest in the debt as an agent of a related company called Atlanta Joint Venture. See *Cadle Co.* v. *Schlichtmann, Conway, Crowley & Hugo*, 338 F.3d 19, 22-23 (1st Cir. 2003).

[4]Relevant news articles published by the Associated Press were picked up by media outlets throughout the country, including The Boston Globe.

"[Schlichtmann] says Cadle, 'surreptitiously' transferred loan accounts to separate corporations and partnerships set up by Daniel Cadle to circumvent state laws governing collection agencies. Cadle used 'strong arm tactics' including threats, intimidation and coercion to collect, Schlichtmann claims";

"[Cadle had] used hardball tactics to try to collect debts, harassing and abusing people by making false reports to ruin their credit, calling their neighbors, talking to children about their parents' debts, threatening to take people's homes, and taking people to court"; and

" '[Cadle] has been illegally going after hundreds of people — vulnerable people, in particular — for years,' [Schlichtmann] said. 'All of the tricks of the trade this company uses in spades. All of it is illegal and all of it is fraudulent.' "[5]

Also in the spring of 2003, Schlichtmann created a Web site, accessible on the Internet. Included on the Web site are statements representing Cadle as a company that employs "fraudulent practices to intimidate and collect millions of dollars from hundreds of [Massachusetts] residents." According to the Web site, Cadle is "a collection arm of a fraudulent enterprise" whose "sole purpose and intent . . . is to defraud consumers and businesses, deceive state and federal courts, and avoid state laws and regulations meant to protect against predatory practices." The Web site provides links to news articles published by various news media outlets containing Schlichtmann's statements that are quoted above. Links provided on the Web site also connect a viewer to the above mentioned March, 2003, G. L. c. 93A demand letter and to court pleadings and other documents submitted to the court in connection with various legal proceedings. The following statements also appear on the Web site:

"This site was created and sponsored by Jan R. Schlichtmann, Attorney At Law, P.C., as a service advertising this

---

[5]In October, 2003, Cadle filed a complaint against the defendants in the United States District Court for the Northern District of Ohio, alleging defamation. This suit was dismissed for lack of personal jurisdiction.

effort. Attorney Schlichtmann has been fighting The Cadle Company for the past [ten] years. . . . Attorney Schlichtmann now represents several other victims of Cadle's unlawful business practices."

The Web site further states:

> "Call 877.CADLETRUTH
> (1.877.223.5387)";

> "To find out more or if you believe you have been victimized by The Cadle Company, contact us directly: 877.CADLETRUTH (1.877.223.5387)."[6]

On January 15, 2004, Daniel Cadle wrote Schlichtmann a letter advising him that information on the Web site was false and defamatory and requesting that Schlichtmann correct any "exaggerations, false statements, and plain old 'bold face lies' in order to mitigate [his] damages."[7] Schlichtmann took no action in response to that letter. It appears that all of the information discussed above remains accessible to the public online as of the time of oral argument.

The events described above led to the present litigation, which we now summarize. On April 12, 2005, Cadle filed a complaint in the Superior Court asserting claims against the defendants. Cadle's first amended complaint alleges defamation and libel

---

[6]The telephone number listed on the Web site is operated solely by Schlichtmann.

[7]In his letter, Cadle took specific exception to four statements on the Web site, enumerated as follows:

> "1. Daniel C. Cadle is a fugitive from justice. As you full well know, I am not a fugitive from justice;

> "2. Daniel C. Cadle has been convicted of contempt. As you also know, I have not been legally convicted of contempt;

> "3. The Commonwealth of Massachusetts ordered The Cadle Company to cease all activities in the Commonwealth of Massachusetts. As you know, the Commonwealth simply ordered Cadle to cease all 'illegal' activities in the Commonwealth, if any, and has never made any determination that Cadle has committed 'any' illegal acts; and

> "4. Schlichtmann has filed lawsuits on behalf of clients against Cadle. As you know, no such lawsuits have, in fact, been filed against Cadle."

(count I); tortious interference with contractual and advantageous business relations (count II); unfair and deceptive trade practices in violation of G. L. c. 93A, § 11 (count III), and seeks a declaratory judgment on the defamation claim (count IV) and a permanent injunction enjoining the defendants from maintaining the Web site in its present form (count V). The defendants accepted service of the complaint on May 6, and, as has been stated, filed a special motion to dismiss pursuant to G. L. c. 231, § 59H.[8] As grounds for the motion, the defendants asserted that Cadle's complaint had been filed in retaliation for Schlichtmann's exercise of his right to petition the government for redress regarding Cadle's business practices. A hearing was held, at which Schlichtmann requested the judge to stay the proceedings pending a ruling on a motion seeking sanctions against Cadle, which Schlichtmann had filed in the United States Bankruptcy Court for the District of Massachusetts. The judge denied the request but allowed Schlichtmann leave to file a motion for reconsideration. After the hearing, but before the judge entered her decision on the special motion, the defendants filed a second special motion to dismiss under the anti-SLAPP statute or, alternatively, to stay the matter pending the ruling of the Bankruptcy Court judge on Schlichtmann's sanction motion.[9] On September 20, 2005, the judge denied both special motions.[10]

2. We now consider the merits of this appeal. General Laws c. 231, § 59H, provides, in pertinent part:

"In any case in which a party asserts that the civil

---

[8]The motion to dismiss also was brought pursuant to Mass. R. Civ. P. 12 (b) (6) and (9), 365 Mass. 754 (1974). Schlichtmann does not argue that dismissal was warranted on these bases and, thus, waives any claim to that effect.

[9]This second motion, apparently, was brought in response to testimony given by Cadle's counsel at an evidentiary hearing on Schlichtmann's motion for sanctions in the Bankruptcy Court. At the hearing, Daniel C. Cadle testified that the defamation suit had been initiated in an attempt to have Schlichtmann remove (or at least modify) his Web site.

[10]Thereafter, Schlichtmann filed a counterclaim against Cadle and took the highly unusual step of filing a third-party complaint against Cadle's counsel. The basis for the third-party complaint is not clear from the record, but we note our approval of the recent decision of *Plante* v. *Wylie*, 63 Mass. App. Ct. 151 (2005), in which the Appeals Court held, as a general principle, that G. L. c. 231, § 59H, protects attorneys who are "sued for voicing the positions of a petitioning client." *Id.* at 157.

claims . . . against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the [C]ommonwealth, said party may bring a special motion to dismiss. . . . The court shall grant such special motion, unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based."

The statute identifies five types of statements that comprise "a party's exercise of its right of petition":

"[1] [A]ny written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government." G. L. c. 231, § 59H.

We have stated that the right to petition may include "reporting violations of law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature, lobbying for legislation, campaigning in initiative or referendum elections, filing agency protests or appeals, being parties in law-reform lawsuits, and engaging in peaceful boycotts and demonstrations." *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 161-162 (1998), quoting Pring, SLAPPs: Strategic Lawsuits Against Public Participation, 7 Pace Envtl. L. Rev. 3, 5 (1989). A SLAPP suit, as a general rule, has no merit. "The objective of SLAPP suits is not to win

them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech" and "to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 161, quoting *Wilcox* v. *Superior Court*, 27 Cal. App. 4th 809, 816-817 (1994). It is not necessary that the petitioning activity be motivated by a matter of public concern. See *Office One, Inc.* v. *Lopez*, 437 Mass. 113, 122 (2002).

The procedure governing an anti-SLAPP motion to dismiss is well established. We recognized in our *Duracraft* decision that, "[b]y protecting one party's exercise of its right of petition . . . the statute impinges on the adverse party's exercise of its right to petition . . . ." *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 166. We require, therefore, as a threshold matter to invoke the statute's protection, that the party seeking dismissal demonstrate, through pleadings and affidavits, that the claims against it are " 'based on' the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." *Id.* at 167-168. At this early stage of the proceedings, "[t]he focus solely is on the conduct complained of, and, if the *only* conduct complained of is petitioning activity, then there can be no other 'substantial basis' for the claim." *Office One, Inc.* v. *Lopez, supra* at 122. If the moving party fails to make this showing, the special motion is denied. If this showing is made, then the burden shifts to the nonmoving party to demonstrate, again by pleadings and affidavits, that "(1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party." G. L. c. 231, § 59H. See *Fabre* v. *Walton*, 436 Mass. 517, 520 (2002); *Baker* v. *Parsons*, 434 Mass. 543, 552 (2001); *McLarnon* v. *Jokisch*, 431 Mass. 343, 349 (2000). In this way, the legislative purpose behind the statute, to protect parties from harassing lawsuits that have no basis in law and that are filed solely to discourage individuals from exercising their right to petition, is furthered. See *Duracraft Corp.* v. *Holmes Prods. Corp.*, *supra* at 166-167. At the same time, the rights of opposing parties, to petition the courts for redress of wrongs unlawfully inflicted by another, are protected. See *Baker* v. *Parsons*, *supra* at 553.

Applying these principles here, we conclude, as did the judge, that the defendants have not met their initial burden of demonstrating that "the *only* conduct complained of is . . . petitioning activity." *Fabre* v. *Walton, supra* at 524. The judge determined, as a factual matter, that Schlichtmann had set up the Web site for commercial reasons, as an informational center that would "direct[] people to his own legal practice to attract business." The judge concluded, therefore, that Cadle's complaint could not be deemed to be based solely and exclusively on the defendants' petitioning activity. We review the judge's decision to determine whether there was an abuse of discretion or error of law. See *Kobrin* v. *Gastfriend*, 443 Mass. 327, 330-331 (2005). There was no error.

An examination of the plaintiff's amended complaint reveals that Counts I, II, and III are based, respectively, on statements contained on the Web site as well as statements made by Schlichtmann to the media that were then republished on the Web site, through electronic links to other Web sites containing the original news articles. Many of the statements, standing alone, had been made in connection with Schlichtmann's petitions to the banking commissioner or complaints to the Bankruptcy or State courts, and republished on the Web site in order to raise public concern over Cadle's (purportedly) questionable business practices. These statements, at first glance, may appear to fall within the literal scope of activities protected by § 59H, because they were "made in connection with an issue under consideration or review by a legislative, executive, or judicial body" or are "reasonably likely to enlist public participation in an effort to effect such consideration." Schlichtmann published the statements on his Web site, however, not as a member of the public who had been injured by these alleged practices, but as an attorney advertising his legal services. The Web site was, in essence, designed by Schlichtmann to disseminate to the public information about Cadle and, by doing so, to attract clients to his law practice.

We reject the defendants' self-serving characterization of the Web site as a "public forum" that is "dedicated to sharing with others information about Cadle's business activities that [Schlichtmann] and other victims have provided to regulatory officials and

the courts and the actions taken by such officials and courts."
Schlichtmann argues that he set up the Web site to inform others
of what he alleged were the unlawful collection activities of
Cadle and, in an affidavit submitted in connection with his second
special motion to dismiss, flatly denies that his Web site was
designed to attract clients to his law practice. Schlichtmann can-
not dispute, however, that he represents parties adverse to Cadle
in litigation and that his Web site, in unambiguous terms, appeals
to other potential clients to contact him. There is nothing in the
record to refute (at this point) the reasonable conclusion that
Schlichtmann created the Web site, at least in part, to generate
more litigation to profit himself and his law firm.

The defendants rely heavily on three decisions of the Appeals
Court, *Wynne* v. *Creigle*, 63 Mass. App. Ct. 246 (2005), *Plante*
v. *Wylie*, 63 Mass. App. Ct. 151 (2005), and *MacDonald* v. *Pa-
ton*, 57 Mass. App. Ct. 290 (2003). We address these cases in
turn. The defendant in *Wynne* v. *Creigle*, *supra*, was a fire
fighter's widow who sought pension benefits after her husband
committed suicide. The defendant maintained, in statements
made in connection with a department investigation of the
plaintiff's workplace conduct and repeated to a newspaper
reporter, that her husband's suicide was precipitated by harass-
ment by the plaintiff. The plaintiff, in turn, sued for defamation,
based on the newspaper's accounts of the statements. The Ap-
peals Court recognized that the defendant's statements to the
newspaper were not unsolicited but were made in direct
response to the "plaintiff's providing the newspaper with the
statements of the firefighters, [and] other documents from the
[disciplinary] hearing" and were "essentially mirror images of
those [the defendant] made during and 'in connection with' the
departmental investigation of the plaintiff. Taken in context,
[the] mere repetition of those statements to the media was also
possessed of the characteristics of petitioning activity." *Id.* at
254. Here, nothing in the record would support a finding that
the challenged statements made by Schlichtmann were either a
response to statements that Cadle had made to the press or
repetitions of statements initially made in a governmental
proceeding. The fact that the news articles containing Schlicht-

mann's statements also refer to various ongoing administrative or judicial proceedings against Cadle does not, by itself, suffice to render the statements themselves petitioning activity protected under G. L. c. 231, § 59H. The *Wynne* decision, therefore, does not assist the defendants.

In *Plante* v. *Wylie*, 63 Mass. App. Ct. 151 (2005), the trustees of a realty trust filed a lawsuit against the attorney who challenged, on behalf of a conservation trust, efforts of the realty trust to win approval for expansion of a subdivision development. See *id.* at 153-154. The Appeals Court reasoned that, although the anti-SLAPP statute is restricted by its language "to those defendants who petition the government on their own behalf," *id.* at 156, quoting *Kobrin* v. *Gastfriend, supra* at 332, the "statute would provide but hollow protection for citizens who wish to exercise their right of petition if statements made by an attorney on their behalf were not covered by the [statute] to the same extent as statements made by them directly." *Id.* We agree with the Appeals Court that suits brought against attorneys who speak on behalf of petitioning parties would have a chilling effect on petitioning activity, and, therefore, the language of G. L. c. 231, § 59H, must be read to protect, not only individuals who petition on behalf of themselves, but also attorneys who are sued for "voicing the positions of a petitioning client." *Id.* at 157. See note 10, *supra.* Our decision in this case, however, does not turn on whether Schlichtmann's statements were made on behalf of himself or on behalf of the clients he represented in the litigation against Cadle. As has been discussed above, it is the palpable commercial motivation behind the creation of the Web site that so definitively undercuts the petitioning character of the statements contained therein.

Finally, in *MacDonald* v. *Paton, supra,* the plaintiff, an elected selectman in Athol, sued the defendant, who operated a Web site that reported on local affairs in Athol and the surrounding community, for publishing on the Web site a description of the plaintiff as a "Gestapo agent." *Id.* at 293. It was undisputed that the Web site was an "interactive public forum on issues relating to Athol town governance, including education funding and municipal use of tax dollars." *Id.* at 294.

Information on the Web site included a section containing citizens' letters, a link allowing individuals to send, by electronic mail, comments and opinions, and an interactive feature, called "The First Dictionary of Athonics," whereby individuals could suggest, also by means of electronic mail, dictionary definitions. The plaintiff's suit was over one such suggested dictionary entry. The Appeals Court reasoned that the defendant had conclusively demonstrated, in her affidavit submitted in support of her special motion to dismiss, that her Web site had been conceived "as a forum for speech by citizens about issues of public and political concern . . . [and] as a technological version of a meeting of citizens on the Town Green, a space where concerned individuals could come together to share information, express political opinions, and rally on town issues of concern to the community." *Id.* at 295. The Appeals Court concluded, therefore, that it was error to deny the defendant's special motion to dismiss pursuant to G. L. c. 231, § 59H. As has been much discussed, however, the Web site in this case (unlike the Web site in *MacDonald*) is of a commercial nature. It is interactive only in the sense that visitors to the Web site might click on a link to contact Schlichtmann. Visitors may not, however, post individual opinions or comments — all of the information that is posted on the Web site originated with Schlichtmann. The Appeals Court's reasoning in the *MacDonald* case, thus, like the reasoning in the *Wynne* and *Plante* cases, is inapplicable to this case.

There is one recent Appeals Court decision that is, in our view, sufficiently on point to provide guidance in this case. That decision, *Global NAPs, Inc.* v. *Verizon New England, Inc.*, 63 Mass. App. Ct. 600 (2005), concerned a statement made in the context of ongoing litigation between two business competitors and published in the Boston Globe, asserting, in effect, that the Department of Telecommunications and Energy had "shut down 'a scam' . . . [the plaintiff] very cleverly developed in the late 1990s." *Id.* at 603. The Appeals Court rejected the defendant's argument that a literal reading of G. L. c. 231, § 59H, protects all statements made "in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding." *Id.* at 604. We

agree with the Appeals Court's conclusion, "[t]hat a statement concerns a topic that has attracted governmental attention, in itself, does not give that statement the [petitioning] character contemplated by the statute." *Id.* at 605. See *Kobrin* v. *Gastfriend, supra* at 332 ("[T]he statute is designed to protect overtures to the government by parties petitioning in their status as citizens. It is not intended to apply to those performing services for the government as contractors"). Without passing judgment on the merits of the underlying claims in this lawsuit, we conclude that an attorney may not claim protection of the anti-SLAPP statute for publishing statements about an adversary at will, in hopes of shoring up his or her own position, attracting potential clients, or otherwise gaining a tactical advantage in an ongoing legal proceeding, even when that proceeding has, as here, attracted a good deal of public and governmental interest. Put more simply, aggressive lawyering of this sort is not protected petitioning activity.

Because the defendants did not make a "threshold showing through the pleadings and affidavits that the claims against [them] are 'based on' the [lawful] petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities," *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 167-168 (1998), the motion to dismiss was properly denied.[11]

4. We affirm the judge's order denying the defendants' motions to dismiss the complaint against them and remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[11]We need not consider the alternate claim advanced by Cadle that the alleged defamatory statements, even if within the scope of petitioning activity, are not deserving of the protection of § 59H because they are devoid of factual or legal basis. See *McDonald* v. *Smith*, 472 U.S. 479, 485 (1985) (right to petition is not shield against liability for libel); *Kobrin* v. *Gastfriend*, 443 Mass. 327, 335 (2005).