Pierce, Laurence D., J.
The matter is before the court on the special motion to dismiss, filed pursuant to G.L.c. 231, §59H, the “anti-SLAPP” statute,[1] by defendants Jon Kurland and Patricia Dzuris (respectively, “Kurland” and “Dzuris”). For the reasons discussed below, the motion is ALLOWED.
Factual and Procedural Background
The plaintiff, Roland Van Liew (‘Van Liew”) and the defendants reside in the Town of Chelmsford, Massachusetts (“Chelmsford” or the ‘Town”). In 2011, Van Liew commenced an effort to recall four elected members of the Town’s Board of Selectman. One of the Selectman targeted by Van Liew’s recall campaign was Kurland. The recall procedure, specified by the Chelmsford Town Charter, required an initial filing of twenty-five signatures from each of the Town’s nine precincts, followed by the filing of signatures constituting ten percent of the registered voters in the Town. Upon satisfying those requirements, a special election would decide whether to recall the selectmen. This litigation relates to Van Liew’s efforts to gather signatures in support of his recall petition and the actions taken by Kurland and Dzuris in opposition to the petition. The litigation also involves statements, alleged to be defamatory, made by Kurland relating to Van Liew’s involvement in Town business and in particular the recall petition.
In an Amended Complaint, filed by Van Liew on March 10, 2014, Kurland, Dzuris and two other defendants,[2] are alleged to have “impaired and infringed upon [Van Liew’s] constitutional right to solicit signatures in support of ballot access as guaranteed by Article 9 of the Constitution of the Commonwealth of Massachusetts” and in violation of G.L.c. 12, §§11H and 1II, the Massachusetts Civil Rights Act (the “Civil Rights Act”). In addition, Kurland is alleged to have defamed Van Liew by “making and publishing . . . derogatory [and] pejorative . . . public statements . . . [which held Van Liew] up to scorn, ridicule, hatred, and contempt...”
More particularly, with respect to the Civil Rights Act violations, it is alleged that on April 20, 2014, Kurland sent an email to thirty people advising them of Van Liew’s recall petition and the “outsiders” that Van Liew had hired to gather signatures (the “canvassers”). The email also encouraged the email recipients to take steps to “discourage [the canvassers] from continuing the effort to get signatures” and in addition, “[i]f you see them at stores or in parking lots, please discuss this with the store manager.” Kurland added, “It is my understanding that DeMoulas and Hannaford frown on this type of activity by their stores . . .” On April 23, 2011, a complaint was made to the store manager of a local grocery store as a result of which canvassers were “ejected from [the] premises and surrounding area.”
On April 24, 2011, Kurland is alleged to have sent four additional emails: the first encouraged the email recipients not to return the recall petition, explaining thát “it will be more difficult for them to get out in numbers if thefy] have less petitions to distribute. ” The second asked an email recipient, “[D]id you complain to the manager?” The third, related to those who had “been deceived into signing the petitions . . . reversing] their signatures.” The final email again referred to signatories being “deceived” and being able to “reverse their signature[s].”
On April 25, 2011, a woman drove up and yelled at one of the canvassers who was collecting signatures at a local grocery store. Van Liew alleges that this was part “of a scheme of harassment organized, orchestrated, created, participated in, and set into motion by” Kurland and/or others."
On April 26,2011, Kurland sent the following email:
It appears as though the local supermarkets are willing to allow the canvassers to sign recall petitions. Could you please take the time to call the three store managers to express deep disapproval of allowing outsiders to destroy our town. If they tell you that these people have the right to be there, that is rubbish. This is private property and the owner can remove them if he or she sees fit. If they persist in asserting the canvassers right to be there asking [sic] them if it is also the right of people in town to stand nearby with posters to boycott their stores. It is the same free speech argument. You can also threaten not to shop at the store again and express the opinion that many of your friends agree with you. Perhaps if they get enough calls, they will remove these people from the premises.
*588 It is also alleged that on April 26, 2011, five canvassers at another local grocery store were “physically intimidated and accosted by a group of individuals who opposed” Van Liew’s recall efforts. In addition, a “pair of men . . . ripped a clipboard from one man’s hand, threatened [the canvassers] with physical harm if they continued, and further threatened the life of [Van Liew]. ” On April 29,2011, a number of canvassers were ejected from the premises of a local liquor store by the store manager. On April 30, 2011, a woman, alleged to be the mother of a former Chelmsford selectman, “physically accosted” two canvassers and “methodically scrawled a large ”NO" directly onto each of [their] four petitions, invalidating some 48 signatures." On May 4, 2011, a canvasser was “harassed” outside yet another local grocery store. Again, it is alleged that Kurland “and/or others” were responsible for each of these incidents.
As far as Dzuris is concerned, it is alleged that on April 26, 2011, she sent an email to Kurland and others suggesting a “letter writing campaign” to the owner of one of the shopping centers. On April 26, 2011, Dzuris sent another email stating, “I heard that they are out in Paramount Plaza Today.”
Kurland is the only defendant named in the count for defamation. There it is alleged that between "approximately late 2010 and early 2011,” Kurland “embarked on ... a sustained and increasingly strident campaign of baseless accusations against [Van Liew].” The Amended Complaint includes over seventy separately numbered paragraphs describing what are alleged to be defamatory statements either made by Kurland directly, or attributed to him in local newspapers, on-line newsletters, Facebook entries and public access television shows. The following is a representative sampling of those statements:[3]
Van Liew’s letters are loaded with inaccuracies which confuse readers.
I hope people see this guy [Mr. Van Liew] for what he is. He wants to generate discontent. There is not one town rep or official I think he is in approval of.
[h]ere is the latest from our local malcontent . . . Van Liew’s allegations are not fact-based . . . the facts are something that don’t concern RVL [Mr. Van Liew]! . . . [t]hanks for reading my rant!;-)
Van Liew “is seeking to upset the entire elected executive branch of Chelmsford on the flimsiest of accusations ...”
Mr. Van Liew’s complaints about our Board have no substance.
Roland Van Liew has misstated numerous facts in his effort to get rid of Paul [Town Manager Paul Cohen].
It is my opinion that Mr. Van Liew wants to buy our town government. Make no mistake about it. While he would like everyone to believe that this is a “grassroots” effort, it is clear that he does not have widespread grassroots support. Why else would he have to hire outsiders to stand at polls to gather signatures or canvass neighborhoods to obtain the signatures to necessary to push his personal vendetta??
I, for one, will do everything within my power to stop this hostile takeover of our town by a man who, in my opinion, wants to use his wealth to dictate who gets hired or fired and effectively run Chelmsford government from the solitude of his home.
I strongly urge every resident to stand tall to oppose this witch hunt.
It is my opinion that Van Liew wants to buy our town government and install people he wants in key positions to do exactly what he wants . . . This process is being abused by a very wealthy man who wants what is HIS vision of Chelmsford.
He [Mr. Van Liew] is angry at George Dixon and Matt Hanson because they voted their consciences and said the Preservation Restriction was poorly drafted (it certainly was) and voted the project was in compliance with the restriction.
Van Liew also wants to recall me because I did not join Richard McClure’s lawsuit against the Planning Board, two sets of Selectmen and other town officials.
[finally, he [Mr. Van Liew] is angry because “continue to vote to pay Kopelman and Paige with your tax money.” This last comment reflects Van Liew’s ignorance of the way that the town is run.
I, for one, will do eveiything within my power to stop this hostile takeover of our town by a man who, in my opinion, wants to use his wealth to dictate who gets hired or fired and effectively run Chelmsford government from the solitude of his home.
That’s right. And Mr. Van Liew is like a guy in a crowded movie theater screaming “fire” and wondering why nobody’s getting up and running out. And that’s because there’s no fire. There’s nothing going on. There are not ethical violations.
Van Liew “has misstated numerous facts in his effort to oust Cohen. He repeatedly refers to the North Road property as ‘the Village Green.’ It was never the ‘Village Green.’ He wants people to believe this was town-owned land when in fact it was owned by Eastern Bank.”
For example, what I really think has happened is he’s used this North Road project as the emotional pot stirrer, if you will... So he grabbed onto North Road, and he had re-characterized the events. Because he’s not backstage. He doesn’t know what’s really going on.
Well, he’s, he’s filed complaints, but each complaint that has been investigated has been shown to be without merit, so. And what has happened is he has spent, I can’t imagine it’s, well, the filing, the most *589 recent filing was $70,000, I think it’s probably considerably more, to basically get an army of people out there to take advantage of the trustworthiness of Chelmsford residents and the fact that we’re all busy. You know, can you sign this petition, what’s it all about, oh it’s about open space, ok sure I’m in favor of open space, or.
So, for him [Mr. Van Liew] to make that allegation that there was a conflict of interest, it’s completely manufactured.
And, and the unfortunate thing is that he is leading people to believe that if they vote yes on the recall that they’re going to be able to stop North Road and undo it. And that is another misrepresentation.
this individual, because of his own person vendetta, has pumped $100,000 into this effort to bring outsiders in, to misrepresent what the Recall Petitions were about, and to get their signatures.
[t]his guy’s [Mr. Van Liew] got an agenda, and he doesn’t care whose reputation he smears.
People, Mr. Van Liew has manipulated the facts, he has distorted the facts, he has not told the truth regarding his relationship with Cheating Chelms-ford. Why would anybody believe anything else he says? That’s so unimportant. This recall is vitally important for our Town. It will affect our Town for decades, because even if, even if one Selectman is recalled, Mr. Van Liew will feel empowered and he will be able to look over the shoulders of the Selectmen every time they vote and he will try to drum up a reason for another recall and he will just continue to pour his money, which apparently is limitless, to fight this.
[h]ere we go again, folks. Roland Van Liew’s (RVL’s) latest email trashing our local volunteer town officials, full of the unfounded accusations, character assassination, and mischaracterization of events.
Mr. Van Liew has “either a complete lack of understanding of the [Affordable Housing] Plan or a deliberate attempt by RVL to misrepresent the facts to achieve his exclusionist goals.”
the fraudulent nature of [Mr. Van Liew’s] rhetoric.
the statement concerning Mr. Van Liew that “our town has a disease which can only be cured by closing the door on his continuous lies and false information from coming into your homes.”
[i]n my opinion, Roland has never let the truth get in the way of a good rant. The sad fact is that the courts have spoken and the project is here to stay. Mature adults recognize that there are circumstances that they don’t like but can’t change and mature adults move on. Apparently some people can’t. Sadly this is costing the taxpayers of Chelms-ford several thousands of dollars in legal fees and costs that could have been used for tax relief or other important town projects.
I can understand that he [Mr. Van Liew) might be too busy to attend meetings but can’t the guy read? Or is he too lazy to spend the time to find out the facts? ... It is truly a shame that this guy has to spout off as an apparent authority over something he knows nothing about!!! The sad news is that some out there will believe him.
regards to Van Liew “[thousands of tax dollars spent defending baseless lawsuits initiated to feed one person’s ego. What a shame!!
You [Mr. Van Liew] filed several [lawsuits] including a freedom of information lawsuit that the judge dismissed very early in the proceedings as being specious and you have appealed the dismissal of your North Road lawsuit. The town cannot ignore any lawsuits even spurious ones like yours.
The special motion to dismiss, filed by Kurland and Dzuris, pursuant to the anti-SLAPP statute, alleges that Van Liew’s claims are based on petitioning activities alone and have no substantial basis other than, or in addition to, the petitioning activity. See Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 167-68 (1998). Kurland and Dzuris also contend that Van Liew cannot meet his corresponding burden of showing that the petitioning activity was devoid of factual support or arguable basis in the law or that he suffered actual injury. See G.L.c. 231, §59H.
In opposition to the special motion, Van Liew contends that, where Kurland and Dzuris are alleged to have intentionally interfered with Van Liew’s right to solicit signatures in support of a recall petition “by intimidation, harassment and coercion,” they cannot avail themselves of the protection of the anti-SLAPP statute. He further alleges that Kurland’s defamatory statements are unrelated to any petitioning activity and, therefore, the anti-SLAPP statute does not apply to those claims.
Discussion
General Law c. 231, §59H, protects the exercise of the constitutional right of petition by providing for a special motion to dismiss SLAPP suits. Office One, Inc. v. Lopez, 437 Mass. 113, 121 (2002). “SLAPP suits have been characterized as ‘generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so.’ ” Duracraft Corp., 427 Mass. at 161, quoting Wilcox v. Superior Court, 27 Cal.App.4th 809, 816-17 (1994). By definition, this type of litigation arises out of citizen contact with a government official, agency, or the electorate. See Canan and Pring, Studying Strategic Lawsuits Against Public Participation: Mixing Quantitative and Qualitative Approaches, 22 Law & Soc’y Rev. 385, 386 (1988); see Duracraft Corp., 427 Mass. at 162, citing Pring, SLAPPs: Strategic Lawsuits Against Public Participation, 7 Pace Envtl.L.Rev. 3, 8 (1989).
*590 The underlying objective of a SLAPP suit is to silence a political opponent by tying up the opponent’s resources, see Barker, Common-Law and Statutory Solutions to the Problem of SLAPPs, 26 Loyola L.A.L.Rev. 395, 405 (1993), and to divert time and effort away from the petitioning activity towards a legal defense, Comment, Strategic Lawsuits Against Public Participation: an Analysis of the Solutions, 27 Cal.W.L.Rev. 399, 404 (1991). In response to this problem, the Massachusetts Legislature enacted the anti-SLAPP statute with the intention that it provide “very broad protection for petitioning activities.” Duracraft Corp., 427 Mass. at 162.
To balance protecting one party’s exercise of its right to petition against impinging on the adverse party’s exercise of its own right to petition, courts have developed a procedure of shifting burdens which govern anti-SLAPP motions. Baker v. Parsons, 434 Mass. 543, 553-54 (2001). To begin, the special movant must demonstrate, by pleadings and affidavits, that the claim to be dismissed is based on the movant’s petitioning activities alone and has no substantial basis other than, or in addition to, those petitioning activities. See Duracraft Corp., 427 Mass. at 167-68; Fabre v. Walton, 436 Mass. 517, 524 (2002). Failure to make that initial showing requires denial of the special motion. Cadle Co. v. Schlichtmann, 448 Mass. 242, 249 (2007). Should that showing be made, the burden then shifts to the nonmoving party to establish, through pleadings and affidavits, both that the movant’s exercise of petitioning rights lacked “any reasonable factual support or any arguable basis in law,” and that those petitioning activities caused the nonmoving party “actual injury.” Baker, 434 Mass. at 551-52, quoting G.L.c. 231, §59H.
A. Civil Rights Act Claims Against Dzuris
The court begins by considering whether Dzuris has shown that Van Liew’s Civil Rights Act claims are based on petitioning activities. As noted, the anti-SLAPP statute protects a wide range of petitioning activities. For this purpose: “Petitioning includes all ‘statements made to influence, inform, or at the very least, reach governmental bodies — either directly or indirectly.’ ” N. Am. Expositions Co. Ltd. P’ship v. Corcoran, 452 Mass. 852, 862 (2009), quoting Global NAPS, Inc. v. Verizon New England, Inc., 63 Mass.App.Ct. 600, 605 (2005). Petitioning activity also includes a citizen’s efforts to communicate with the electorate. See Duracraft Corp., 427 Mass. at 162. When assessing whether statements constitute protected petitioning, the court considers them “in the over-all context in which they were made,” N. Am. Expositions Co. Ltd. P’ship, 452 Mass. at 862, and disregards any underlying motive. Office One, Inc., 437 Mass. at 122; see also Polay v. McMahon, 468 Mass. 379, 386 (2014).
As previously stated, this case arises out of Van Liew’s efforts to recall four Chelmsford selectmen, including Kurland. The recall petition procedure, as provided by the Town’s charter, first required gathering signatures from registered voters and then a special town election. Van Liew’s efforts generated much debate and significant opposition in Chelmsford. Among those actively opposed were Kurland and Dzuris.
The statements of Dzuris at issue here are the contents of two emails sent to approximately thirty-people, including Kurland. One suggested a “letter writing campaign” regarding the “Hannaford/Wal-Mart” shopping center and provided contact information for the company that owned the center. The other email stated, “I heard that they are out in Parlmount Plaza Today.” Van Liew contends that both communications refer to canvassers’ signature gathering activities in those areas.
When considered as part of the debate surrounding the recall petition, Dzuris’s emailed suggestion that others opposed to the petition should voice their disapproval and where the canvassers were expected to be, is petitioning activity within the meaning of the anti-SLAPP statute. The statements were made for the purpose of influencing or informing the actions of, or at least reaching, a governmental body. See N. Am Expositions Co. Ltd. P’ship, 452 Mass. at 862. The fact that in one communication Dzuris urges opposition to the recall petition, directed at the owner of the shopping center, does not change the result. The other communication, apparently referring to canvassers in Parlmount Plaza, was an email to like-minded individuals made in connection with their common political opposition to recalling the selectmen. As such, this also constitutes protected petitioning.
At base, these emails concern efforts in opposition to a petition to recall publically elected officials, directed to members of the electorate who would decide any recall election. The communications had sufficient relationship to the recall petition to enjoy constitutional protection. See Plante v. Wylie, 63 Mass.App.Ct. 151, 159 n.9 (2005) (communications between private citizens constitute protected petitioning activity when statements are closely and rationally related to public proceeding and in furtherance of obj ective served by consideration of issue under review in proceeding).
Next the court considers whether Van Liew has based his claims against Dzuris on her petitioning activities alone, or whether his claims have a substantial basis other than, or in addition to, those activities. Van Liew’s Amended Complaint alleges that Dzuris’s actions “interfered” with his petitioning efforts and, in essence, led to others taking actions that frustrated gathering signatures from petition supporters. He contends that Dzuris’ actions went beyond the pursuit of her petitioning rights because she “use[d] threats, intimidation, and coercion” sufficient to violate his civil rights, and caused others to do so too.
*591 An examination of Van Liew’s complaint reveals no nonconclusory factual basis for that contention. A formulaic recitation of the elements of a cause of action or conclusoiy assertions of liability are insufficient to demonstrate that the claims arise from anything other than protected petitioning activity. See Baker, 434 Mass. at 551. Where, as here, the only conduct complained of is petitioning activity, there can be no other “substantial basis” for the claim. See Office One, Inc., 437 Mass. at 122; cf. Brice Estates, Inc. v. Smith, 76 Mass.App.Ct. 394, 396 (2010) (where underlying conduct involves both petitioning activity and activity not considered petitioning, court must deny special motion to dismiss under §59H).
Having concluded that Van Liew’s claims against Dzuris are based on petitioning activity alone, the court next considers whether Van Liew has established that Dzuris’s exercise of her right to petition “was devoid of any reasonable factual support or any arguable basis in law.” G.L.c. 231, §59H. See Baker, 434 Mass. at 551-52. Van Liew alleges that Dzuris, individually and in concert with others, engaged in “threats, intimidation, and coercion” sufficient to violate his civil rights. A party resisting dismissal under §59H cannot satisfy the evidentiary burden at this stage simply by resting on allegations in unverified pleadings. MacDonald v. Paton, 57 Mass.App.Ct. 290, 295 (2003) (it was error to deny special motion to dismiss where nonmovant failed to provide affidavits or other evidentiaiy materials to show that petitioning activity had no reasonable factual support or arguable basis in law, and that the activity caused the nonmov-ant actual harm); see Marabello v. Boston Bark Corp., 463 Mass. 394, 398 n.5 (2012) (“vast difference” between §59H standard and rule 12[b][6] standard). While the record contains evidence that some petition opponents confronted Van Liew’s canvassers, no evidence connects those actions to Dzuris, or supports Van Liew’s claims that those actions derived from a conspiracy in which she participated. Indeed, the record contains an affidavit from the Chelmsford Chief of Police stating that the police did not find evidence of any organized effort to interfere with the canvassing.
Because Van Liew has not offered evidence to prove Dzuris’ petitioning activity “was devoid of any reasonable factual support or any arguable basis in law,” G.L.c. 231, §59H, her special motion to dismiss under §59H is allowed.
B. Civil Rights Act Claims Against Kurland
Here we consider communications by Kurland that Van Liew alleges constitute violations of the Civil Rights Act. As before, the first question is whether the claims are based on petitioning activity and again, the court will consider the communications “in the overall context in which they were made.” N. Am. Expositions Co. Ltd. P’ship v. Corcoran, 452 Mass. at 862. All of the statements recited in Van Liew’s Amended Complaint concern Kurland’s opposition to the recall petition and, in particular, mobilization of the opposition within the Chelmsford electorate. In his April 26, 2011 email, Kurland encouraged calling local supermarket managers and pressing the managers until the canvassers were removed. Strident entreaties to political allies in the local electorate, made in connection with a public proceeding, are qualitatively distinct from the sort of physically interfering, intrusive, and harassing actions which courts rejected as protected petitioning. See, e.g., Garabedian v. Westland, 59 Mass.App.Ct. 427, 432 (2003); Ayasli v. Armstrong, 56 Mass.App.Ct. 740, 748-49 (2002). As such, Kurland’s communications, viewed in the context of the recall petition discourse, fall within the expansive protections afforded by the anti-SLAPP statute.
As before, the next issue is whether the civil rights claims against Kurland are based on petitioning activities alone. Like Dzuris, Kurland actively opposed the recall petition efforts, and it is evident from a reading of Van Liew’s complaint that Kurland encouraged others in connection with that opposition. Notwithstanding Van Liew’s conclusoiy assertions to the contrary, see Baker, 434 Mass. at 551, the Civil Rights Act claims against Kurland, like those against Dzuris, are based on Kurland’s petitioning activities alone.[4]
Accordingly, the burden shifts to Van Liew. Here again, Van Liew offers no evidence to prove that the petitioning activity at issue “was devoid of any reasonable factual support or any arguable basis in law.” G.L.c. 231, §59H. As with the claims against Dzuris, Van Liew rests on the allegations in his complaint, which lack the necessary substantiation. See MacDonald, 57 Mass.App.Ct. at 295. Therefore, Kurland’s special motion to dismiss the count alleging Civil Rights Act violations is allowed.
C. Defamation Claim Against Kurland
The final matter concerns Van Liew’s defamation claim against Kurland. The numerous statements cat-alogued in Van Liew’s complaint all concern opposition to the recall petition.
The statements at issue here were all made to influence the Chelmsford electorate regarding the recall petition, and none was an expression or insinuation of a falsehood that could damage Van Liew’s reputation. As such, the statements constitute petitioning activity within the meaning of the anti-SLAPP statute. See N. Am. Expositions Co. Ltd. P’ship v. Corcoran, 452 Mass. at 862. As with the other allegations, an examination of Van Liew’s complaint makes clear that there is no basis for the defamation count other than, or in addition to, the statements set out therein. Cf. Brice Estates, Inc. v. Smith, 76 Mass.App.Ct. at 396.
Under the now familiar framework, the burden once again shifts to Van Liew to prove that the exercise of petitioning rights lacked adequate factual or legal foundation. See Baker, 434 Mass. at 551-55. Van Liew *592 contends that the statements by Kurland were false and defamatory, and accordingly not entitled to protection under the right to petition. See McDonald v. Smith, 472 U.S. 479, 484 (1985) (right to petition is not right to express damaging falsehoods in exercise of that right).
Here again, however, Van Liew has not offered evidence to satisfy his burden. Instead of demonstrating the falsity of any of Kurland’s statements, Van Liew cites his own conclusory allegations that the statements are “false and defamatory,” and published “with the knowledge that the[y] were false” or “with reckless disregard as to the[ir] truth.” Some of the statements are not defamatory because they express Kurland’s opinion alone, see King v. Globe Newspaper Co., 400 Mass. 705, 709, 713 (1987), and others are statements of fact or a combination of opinion and fact, see, e.g., Driscoll v. Brd. of Trs. of Milton Acad., 70 Mass.App.Ct. 285, 296-97 n. 10 (2007), which alone do not suffice to prove that Kurland’s petitioning activity “was devoid of any reasonable factual support or any arguable basis in law.” G.L.c. 231, §59H. See MacDonald, 57 Mass.App.Ct. at 295. Accordingly, Kurland’s §59H special motion to dismiss the defamation count is allowed.
ORDER
Therefore, it is ORDERED that the motion of defendants Jon Kurland and Patricia Dzuris for judgment in their favor pursuant to G.L.c. 231, §59H, be, and hereby is, ALLOWED.

 “SLAPP” refers to Strategic Lawsuit Against Public Participation. Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 167 n.7 (1998), citing Pring, SLAPPs: Strategic Lawsuits Against Public Participation, 7 Pace Envtl.L.Rev. 3, 4 (1989).

 The additional defendants, Catherine and Albert Dubinsky, have filed a motion to dismiss, pursuant to Mass.R.Civ.P. 12(b)(6), or in the alternative to sever the claims made against them from those made against Kurland and Dzuris. That motion is the subject of a separate decision and order.

 In some instances the court has included all of the material that Van Liew attributes to Kurland in a particular paragraph of the Amended Complaint; in other instances only part is included. The court has not undertaken to note what appear to be typographical and grammatical errors and misspellings. All punctuation in this section appears as it does in the Amended Complaint.

 Although Van Liew has alleged that some petition opponents engaged in conduct that could be considered unprotected “threats, intimidation or coercion,” as those terms are defined in Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994), the record before this court is insufficient to connect Kurland with any unprotected actions.